Argued and submitted June 17, 1981, affirmed March 22,
reconsideration denied April 27,
petition for review denied July 27, 1982 (293 Or 394)

## STATE OF OREGON,
*Respondent,*

*v.*

## KENNETH OWEN TROW,
*Appellant.*

## (No. 79-06-31954, CA 19840)

642 P2d 1178

Charles J. Merten, Portland, argued the cause for appellant. With him on the brief was Merten & Saltveit, Portland.

Thomas H. Denney, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General, and William F. Gary, Deputy Solicitor General, Salem.

Before Buttler, Presiding Judge, and Warden and Warren, Judges.

WARREN, J.

## WARREN, J.

Defendant appeals his conviction after jury trial for unlawful use of a vehicle. ORS 164.135. We affirm.

Defendant was indicted by secret indictment in June, 1979:

"The above-named defendant is accused by the Grand Jury of Multnomah County, State of Oregon, by this indictment of the crime of UNAUTHORIZED USE OF VEHICLE committed as follows:

"The said defendant, between February 20, 1979 and March 24, 1979, in the County of Multnomah, State of Oregon, did' unlawfully and intentionally use a vehicle, to-wit: a 1966 Chrysler, Oregon License No. CFD 158, owned by Leonard Mohler and Michael I. Luce, the said defendant having custody of the said vehicle pursuant to an agreement between the said defendant and Leonard Mohler and Michael I. Luce whereby the said defendant was to perform for compensation a specific service for Leonard Mohler and Michael I. Luce involving the repair of said vehicle, said use being without the consent of Leonard Mohler and Michael I. Luce, and for the said defendant's own purpose in a manner constituting a gross deviation from the agreed purpose, contrary to the Statutes in such cases made and provided and against the peace and dignity of the State of Oregon.

"* * * * *"

Defendant moved to dismiss and, alternatively, for a hearing equivalent to a preliminary hearing before trial. Those motions were denied.

In September, 1979, defendant petitioned the Supreme Court for a writ of mandamus, seeking to compel the circuit court either to dismiss the indictment or to grant defendant a hearing equivalent to a preliminary hearing or to show cause why it had not done so. Defendant then demurred to the indictment. In October, the Supreme Court issued an alternative writ of mandamus, ordering the circuit court to show cause why it had not granted defendant's motion. The circuit court overruled the demurrer in November.

Defendant next moved in the Supreme Court for an order staying the trial in the circuit court until further order of the Supreme Court on the petition for mandamus.

On December 11, 1979, the Supreme Court granted the stay "pending the issuance of [its] decision." An opinion dismissing the petition was handed down on June 3, 1980, 289 Or 265, 611 P2d 1169 (1980), and an opinion denying defendant's petition for rehearing was filed September 23, 289 Or 673, 616 P2d 496 (1980). However, the mandate dissolving the stay was not issued by the Supreme Court until November 20, and was not received in Portland until November 21, 1980.

On November 18, 1980, trial commenced. Just before jury selection, defendant moved for an order requiring one of the victims, Michael Luce, to submit to a defense interview and for a continuance until that interview was completed. The motion was denied.

Mohler testified that the Chrysler had belonged to his deceased wife, that Automotive Emporium had repaired the car in the summer of 1978, and warranted that work, and that he understood that he would not have to pay for any later work done on the car under that warranty. Mohler said that his wife had died in September, 1978, just before he agreed to sell the car to Luce. He had gone on an 18-month drunk after her death, during which he drank every day until he "felt better." He lived near defendant's business and often went there to talk to defendant but was not sure of the content of those conversations, because he had been "upset" during that period. Mohler did remember that he wanted to sell the Chrysler for about $600 and that defendant had told him that he could get Mohler more than $600 for the car.

Luce testified for the state that, in early 1979, he had orally contracted to purchase the Chrysler from Mohler and had taken the car to Automotive Emporium for minor electrical work. After telling people there that he was "interested in buying" the car and after determining that they would honor a warranty of work done for Mohler the previous summer, Luce left the car for repair. He subsequently learned that the car had been used by Automotive Emporium as a loaner. He had not authorized defendant or anyone else to use the car as a loaner.

Defendant testified that he was general manager of Automotive Emporium, Inc. He said that Mohler had

been in need of money and had told defendant that he planned to sell the car for $600. Defendant said that he told Mohler in late 1978 or early 1979 that defendant could get more than $600 for the car and that, if he could not, he would buy it himself for Automotive Emporium's use as a loaner. Defendant had not given money to Mohler for the car before using the car as a loaner, because, he said, he was waiting for Mohler to deliver the title. As a result of defendant's use of the vehicle as a loaner, the car was left dirty and damaged.

■ Defendant first contends that the trial court was without jurisdiction to try him before the mandate had issued in the collateral mandamus case. The Supreme Court had stayed this case pending issuance of its *decision*, not of its mandate. It issued its decision June 3, 1980, and denied rehearing September 23, 1980. Its mandate did not issue until November 20, 1980, two days after trial began, five and one-half months after its original decision and nearly two months after it denied rehearing.

Although the parties did not include in the record any premandate document evidencing notice of the Supreme Court's decision, we presume that defendant received notice before September 23, 1980, in order to have petitioned for the rehearing denied that day.

The question is not of notice but of jurisdiction. We hold that the stay was dissolved no later than September 23, 1980, by the terms of the Supreme Court's order re-entered that day. *Cf. State v. Houghton,* 45 Or 110, 111-112, 75 P 887 (1904) (on retrial after reversal on appeal, judgment reversing and ordering new trial gives trial court authority to proceed; mandate is merely official evidence). The trial court had jurisdiction to try defendant on November 18, 1980.[1]

---

[1] Defendant did not object before or at trial that he was without notice, or the court without jurisdiction, because the mandate had not yet issued. Subject matter jurisdiction is not waived for failure to object before or at trial. Objections to notice or other defenses and objections are waived if not timely raised: no later than the responsive pleading in some cases and never later than at trial, except for subject matter jurisdiction. ORCP 21. Defendant waived any valid objection to lack of mandate. *Cf. Dickson v. King,* 151 Or 512, 514, 49 P2d 367 (1935) (proceeding to trial, when counsel knew that mandate was on file with trial court clerk but had not been entered in lower court journal, waived objection to proceeding before entry, such objection is not jurisdictional.)

■ The trial court did not err in overruling defendant's demurrer to the indictment for lack of specificity. The indictment tracked the language of ORS 164.135(1)(b)[2] and charged defendant with intentional "use" for his own purpose of a specific vehicle, without the owner's consent and "in a manner constituting a gross deviation from the agreed purpose" of "perform[ing] for compensation a specific service * * * involving repair" of the car. That was sufficient

> "* * * (1) to inform the accused of the nature and character of the criminal offense * * * with sufficient particularity to enable him to make his defense, (2) to identify the offense so as to enable the accused to avail himself of his conviction or acquittal thereof in the event that he should be prosecuted further for the same cause, and (3) to inform the court of the facts charged * * *." *State v. Smith,* 182 Or 497, 500, 188 P2d 998 (1948), *quoted in State v. Sanders,* 280 Or 685, 687-88, 572 P2d 1307 (1972).

Definition of intentional misuse as deviation from the agreed purpose of repair was enough. Just as the exception carved in *Sanders* for burglary indictments does not require allegation of *elements* of the crime intended upon unlawful entry, so here misuse need not be defined beyond "gross deviation" from the agreed purpose of repair. *State v. Sanders, supra,* 280 Or at 690.[3]

■ Defendant's third assignment is denial of his motion for a post-indictment "preliminary hearing." Defendant's equal protection arguments were raised and found wanting in *State v. Clark,* 291 Or 231, 630 P2d 810, *cert den* 454 US 1084 (1981), and *State v. Edmonson,* 291 Or 251,

---

[2] ORS 164.135(1)(b) provides:

"A person commits the crime of unauthorized use of a vehicle when:

"* * * * *

"(b) Having custody of a vehicle, boat or aircraft pursuant to an agreement between himself or another and the owner thereof whereby he or another is to perform for compensation a specific service for the owner involving the maintenance, repair or use of such vehicle, boat or aircraft, he intentionally uses or operates it, without consent of the owner, for his own purpose in a manner constituting a gross deviation from the agreed purpose * * *."

[3] *Sanders* does require allegation of the specific crime intended in order to give notice of the criminal intent the defendant is charged to have had. We need not reach the question here whether this indictment would have been sufficient to specify intent had it not specified the nature of the "specific service."

630 P2d 822 (1981). As in those cases, defendant here has not shown how, if at all, he was denied

> " 'individually, or [as a member of] a class * * *, the equal privilege of a preliminary hearing with other citizens of the state similarly situated.' * * * In other words, defendant's constitutional claim requires a showing how the choice of procedure is administered, and whether it offers or denies preliminary hearings to individual defendants, or to social, geographic, or other classes of defendant *(apart from the 'classification' formed by the choice itself)* purely haphazardly or otherwise on terms that have no satisfactory explanation * * *." 291 Or at 253-254 (quoting *State v. Clark, supra*, 291 Or at 243). (Emphasis added.)

Defendant also claims that grand juries no longer serve their intended function as an alternative to probable cause hearings and, therefore, that grand jury indictments violate due process. Although conceivably a grand jury could be so manipulated as to deny due process, defendant has not shown that *his* grand jury was so manipulated or that *all* grand juries are so manipulated.

■ Defendant next contends that the trial court should have granted his motion to require Luce to submit to a defense interview. Luce's decision not to talk to the defense was his own. The prosecution did not advise or suggest that he should not talk to the defense. Defendant was afforded both discovery of Luce's statement to police and full cross-examination at trial. He had no absolute right to compel Luce to speak with defense counsel, *State v. York*, 291 Or 535, 541, 632 P2d 1261 (1981), and has not shown prejudice or inability to cross-examine the reluctant witness. The trial court did not abuse its discretion.

■ Defendant's fifth and sixth assignments are the trial court's denials of his motions for acquittal and directed verdict. At trial, defendant's ground was insufficient evidence to prove criminal intent, gross deviation from intended purpose, or a claim of right to the car in another superior to defendant's.[4]

---

[4] On appeal, defendant argues for the first time that there was no evidence that defendant was to perform a service for compensation, an element of the crime, because the only compensation involved was for the original repair in May, 1978. Even if this could be construed as raised below under the issue of gross deviation from the intended purpose, there was evidence that the car was to be repaired under a warranty for past, paid work.

Defendant's own testimony was that he had not paid Mohler for the car or received title from Mohler before he lent the car; he had agreed to buy the car if he could not otherwise sell it for Mohler. That was evidence that his "claim of right" was not superior to that of the victims.

The state presented evidence that the intended purpose was repair. Defendant's evidence was that he was Mohler's agent to sell the car; he did not offer evidence that loaning the car to his customers was within the scope of the claimed agency. It was for the jury to determine if defendant's use of the vehicle as a loaner was a gross deviation.

■ Defendant's final assignment is that the court erred in excluding his wife's testimony about two telephone conversations she had overheard in the winter of 1978-79. Defendant offered the testimony to show his state of mind. The court sustained the state's hearsay objection after defendant's offer of proof. Mrs. Trow would have testified that she had overheard defendant's end of his telephone conversations with his accountant and with Mohler.[5] Defendant does not dispute that the evidence was hearsay

---

[5] The offer of proof of the telephone conversations was:

"Q. What was the conversation [with the accountant]?

"A. Ken explained to him that — or asked him if he remembered the Chrysler we worked on, he had, because he comes down to our shop quite a bit, he remembered it from the summer because Ken talked to him about Mohler because he felt so darn sorry for him, he just said: You remember that '66 Chrysler? And Don said: Yes. And Ken said: Well, I am trying to help Mr. Mohler sell it because his wife died recently and he has got all sorts of problems and he can't drive and he says if I can't sell it for more than 600 I am going to buy it from him but, you know, it's really a good car, just put whatever amount of money to front end, working on it, and, you know, one of his daughters needed, because he was looking for a car for one of his daughters, Donna then, and asked if one of the daughters or maybe a client that he had might need the car.

"Q. Okay. With respect to the phone conversation that you heard Mr. Trow's half of it, would you tell first of all why it is that you think Mr. Mohler was on the other end, and then what the substance of the conversation was that you heard?

"A. Well, I heard Ken remark Leonard a couple of times. He calls him by his first name and he was talking about the Chrysler and he was telling him be foolish to sell it now, that he should be able to get more than $600 out of it, and it was a good car and all that. If he tried to shop it around, see if he could get more money and if, you know, at least would buy it himself for 600 and use it as a loaner if he needed to."

but argues that the testimony was relevant and admissible to show his mental state as to whether he felt he had authority to use the car.

The offer of proof at most corroborated defendant's and another witness' testimony. Any error in excluding this evidence, offered for a non-hearsay purpose, was harmless. As discussed above, even if the jury believed defendant's version of the facts, he did not establish that he bought the car from Mohler or that he had a claim of right to use the car as a loaner before he actually bought it. The proffered testimony does nothing to dispute the element of an agreed purpose of repair; in fact, it shows that defendant had not bought the car and that, if he had told Mohler of plans to use the car as a loaner, they were plans so to use the car *after* he bought it.

Affirmed.